334 P.2d 765

Elizabeth HENNINGER, widow of Merle Henninger, Deceased, Petitioner,

v.

Marlin S. PORTER, Respondent Employer,

and

Industrial Commission of Arizona, Respondent.

No. 6488.

Supreme Court of Arizona.

Jan. 28, 1959.

Conner & Mahoney, Phoenix, for petitioner.

Axline & Shelley, Holbrook, for respondent employer.

James D. Lester, Phoenix, for respondent Commission.

UDALL, Justice.

This is a "no insurance" case. It grows out of a claim by Elizabeth Henninger against Marlin S. Porter, employer, for death benefits under the Workmen's Compensation Law for the death of her husband, Merle Henninger, caused, as claimed, by an accident arising out of and in the course of his employment. The petitioner, being dissatisfied with the noncompensable award as to "death benefits" made by the Industrial Commission of Arizona (hereinafter referred to as Commission), brings the matter by certiorari to this court for review.

Henninger, aged 58 years, an experienced caterpillar tractor operator, was employed on December 23, 1954, by contractor Porter who was building roads in the Heber area. Porter will hereafter be referred to as respondent or employer.

It is conceded that on December 28, 1954, Henninger suffered an injury due to an accident which arose out of and in the course of his employment. At the time, he was pushing logs with the "cat" when a limb accidentally flew up, hit him across the side of the head, and knocked him out. The attending physician, Dr. Ellsworth of St. Johns, described the nature and extent of the injury as:

"Linea fracture of skull, lacerated right ear with half of it destroyed, cerebral concussion, fracture involving semi-circular canals and nerve center of balance."

Shortly thereafter the injured man was moved from the St. Johns Community Hospital to Phoenix where better medical facilities were available.

Merle Henninger was never able to return to work and died on September 23, 1956. This workman during his lifetime made timely application for compensation and, although the respondent-employer— who had 12 or 15 employees at the time— was not insured as required by law, the Commission properly assumed jurisdiction under the provisions of A.R.S. § 23–907, which allows an award to be made against a non-insured employer. The Commission first made decedent an award for temporary disability and later entered a final award for compensation for temporary total disability covering a period of 21 months, i. e., from date of injury to date of death. In all, $5,023.50 was paid thereunder and no questions are here raised as to the correctness of these awards.

Upon the death of decedent, his widow petitioned for death benefits under A.R.S. § 23–1046, claiming that his death was causally connected with the original injury. Based upon the record then before it the Commission, on January 25, 1957, awarded her death benefits. Application for rehearing was filed by the respondent employer. A rehearing was granted and considerable testimony, mostly medical in nature, was adduced. Thereafter the Commission reversed itself and by an award dated May 15, 1957, ordered that petitioner "take nothing by reason of her widow's claim for death benefits." Its pertinent findings made in support of this order are:

"1. That claimant Merle Henninger's death on September 23, 1956, was in no way due to or proximately caused by his accident of December 28, 1954, or the injuries sustained therefrom.

"2. That claimant Merle Henninger's accident of December 28, 1954 and his injuries sustained therefrom in no way caused in whole or in part or contributed in whole or in part to his death on September 23, 1956.

"3. That claimant Merle Henninger's death on September 23, 1956, was the result of a physical condition totally and completely unrelated to his accident of December 28, 1954 and injuries sustained therefrom. * * *."

Petitioner has astutely recognized her burden, and in her sole assignment of error sets out the grounds she relies upon for a reversal of the award:

"The Commission erred in denying petitioner death benefits, for the reason that the evidence strongly indicated the injuries suffered by the deceased employee contributed to his death; and

conversely, there was no substantial evidence to support the Commission's decision that no causal connection existed between the injury to deceased and his death."

The governing principle is set out in Hartford Accident & Indemnity Co. v. Industrial Commission, 38 Ariz. 307, 314, 299 P. 1026, 1028, viz.:

"The fact that Kronnick (the employee) had a weak or diseased heart would not relieve the employer or his insurer from liability for his death, providing the accident and consequent injuries had the effect of *aggravating such disease and hastening or accelerating his death.* (Citing cases.)" (Emphasis supplied.)

Dr. Daniel J. Condon, who is a pathologist and Maricopa County Medical Examiner, at the request of the coroner performed an autopsy upon the body of decedent within twenty-four hours after his death. The death certificate, signed by Doctor Condon, gives the cause of death as:

"Aspiration gastric contents—Arteriosclerotic heart disease."

At the rehearing, Dr. Condon elaborated upon his autopsic findings by stating:

"Q. Now, then, Doctor, did you from your autopsy, did you find from that autopsy anything that would indicate any connection between a trauma or head injury with the causes you determined were the causes of death?

A. I did not, I reported what I observed.

"Q. And you found no connection from your autopsy? A. From the autopsy I could not develop a connection.

"Q. And did you section the brain? A. I did.

"Q. Any further statement you feel might be pertinent that I may have overlooked, not being a doctor myself?

A. Nothing from the standpoint of your case."

This conclusion of Dr. Condon's was substantiated and supported in part by a witness called by respondent, one Dr. Pfeil, a neurological surgeon, who after a series of hypothetical questions stated that, in his opinion, decedent did not die as a result of, nor was his death accelerated by, the injury suffered twenty-one months before:

"Q. Assume, Doctor, upon the autopsy of the decedent on the day after his death there were on sections of the myocardium there was found the existence of grey-white streaks of scar tissue; does such a finding indicate and is such a finding related to atherosclerotic heart disease? A. It is related to atherosclerotic heart disease, and is

the usual finding with such a diagnosis of sectioning the heart and it indicates that there has been a prior condition of so-called ischemia.

"Q. Will you explain the word ischemia? A. Which means a lack of proper blood flow, and, as we well understand, all tissues need adequate blood flow because it contains vital material or oxygen which is most necessary to the life of individual cells. And with a depletion of the oxygen supply the cerebrum changes can be explained.

"Q. And then there would be no particular connection between such a fact and a brain injury which occurred approximately, if there was a brain injury, which occurred approximately 21 months earlier? A. I know of no logical connection of brain injury because of the atherosclerotic changes in the heart and the resulting residuals therefrom."

Counsel for petitioner endeavored to offset this testimony, and establish a causal connection between the head injury and death by examining Dr. Hildebrand, an osteopathic-physician who attended decedent on four occasions prior to his death, and Harry Francis Steelman, M. D., who qualified as a neurological surgeon. The latter, while actually observing decedent during visits to his office, was not present at the autopsy; however, he did conduct a series of electroencephalograms and slide tests and came to the conclusion that decedent died as a result of his original injury:

(Dr. Steelman)

"I performed an electroencephalogram that was borderline normal and showed mild irregularities. We performed a lumbopheumo-encephalogram, which is a procedure whereby the spinal fluid is replaced with air and x-rays are taken and the procedure indicated there was atrophy and shrinkage of the brain.

\*     \*     \*     \*     \*     \*

"The microscopic appearance of this, coupled with the clinical and radiographical findings, indicate that there was a severe injury to the brain. In my opinion *it is likely that his death was related to this injury*. It is true that Dr. Condon has stated he died of an aspiration of gastric contents, but is likely that this was due to a depression state of consciousness, and since the brain is the seat of consciousness, then a causal relationship can be assumed." (Emphasis supplied.)

It should be noted that from lay witnesses at the rehearing there was evidence given to the effect that Henninger was not in good health prior to his head in-

jury; the decedent himself was quoted as having stated that he had "hardening of the arteries", "stomach trouble", and "only two to three years to live in this dust". There was also lay testimony as to his lack of a "sense of balance" in operating the caterpillar and also in his manner of walk.

█ Undoubtedly the question as to whether the heart ailment of decedent, and not the original accident, was the proximate cause of his death, or the hastening or accelerating thereof was a proper subject for expert medical testimony. The intricacy of it forecloses non-expert evidence. It is our opinion that, at best, this record does nothing more than create a conflict in the medical evidence as to the cause of death. It is well established in this jurisdiction that where the medical evidence is in conflict, the findings of the Commission are binding upon this court.

We hold there is evidence of a substantial nature to support the findings of the Commission and the resulting award denying death benefits. The Commission is the trier of the facts and we have no right to substitute our judgment therefor, even though to the layman this denial of benefits might appear harsh and unrealistic.

Award affirmed.

PHELPS, C. J., and STRUCKMEYER, JOHNSON, and BERNSTEIN, JJ., concurring.